UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DEANNA COMBERGER,              Case No. 1:14-cv-435

     Plaintiff,                                       Beckwith, J.
                                                            Bowman, M.J.
     v.

CAROLYN W. COLVIN,
Acting COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Deanna Comberger filed this Social Security appeal in order to challenge the Defendant's findings that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error, both of which the Defendant disputes. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

**I.  Summary of Administrative Record**

On February 22, 2011, Plaintiff protectively filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), alleging disability as of August 10, 2010. (Tr. 248-63). After Plaintiff's claim was denied initially and upon reconsideration, she requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). An evidentiary hearing, at which Plaintiff was represented by counsel, was held on October 22, 2012. (Tr. 43-103). An impartial a vocational expert, Bonnie Brasher

Ward, was also present and testified. On December 16, 2012, the ALJ denied Plaintiff's application in a written decision. (Tr. 21-38).

The record on which the ALJ's decision was based reflects that Plaintiff was 31 years old at the time of the administrative hearing. Plaintiff has a high school education and past relevant work as a metal door assembler, caregiver, collection agent, and laborer. She alleges disability since August 10, 2010 due to a combination of impairments, including chronic obstructive pulmonary disorder (COPD), obesity, depression, panic disorder with agoraphobia, anxiety, bipolar disorder, right shoulder rotator cuff tendonitis/subacromial bursitis, and attention deficit and hyperactivity disorder (ADHD). She is insured for SSD benefits through March 31, 2016.

Based upon the record and testimony presented at the hearing, the ALJ found that Plaintiff had the following severe impairments: "chronic obstructive pulmonary disorder (COPD), obesity; depression; panic disorder with agoraphobia; anxiety; bipolar disorder; right shoulder rotator cuff tendonitis/subacrominal bursistis; attention deficit and hyperactivity disorder (ADHD); caffeine intoxication; caffeine-related disorder; caffeine dependence; and, nicotine dependence." (Tr. 23). The ALJ concluded that none of Plaintiff's impairments alone or in combination met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subp. P, Appendix 1. The ALJ determined that Plaintiff retains the following residual functional capacity ("RFC"):

> She can lift 20 pounds occasionally and 10 pounds frequently, sit six hours and stand/walk two hours in an eight-hour day. Additionally, she can frequently stoop, kneel, push and pull, and can never climb ladders, ropes, or scaffolds and only occasionally reach in all directions and lift overhead with the right upper extremity, which is the dominant upper extremity. She should avoid concentrated exposure to pulmonary irritants, humidity, wetness, extreme cold and heat. She is limited to simple,

2

>routine and repetitive tasks in a job with only occasional changes in the work setting and only occasional interaction with supervisors and co-workers, and brief and superficial interaction with the general public.

(Tr. 26). Based upon the record as a whole including testimony from the vocational expert, and given Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff is unable to perform her past relevant work, however, she can perform other jobs that exist in significant numbers in the national economy, including such jobs as parking lot attendant and semi-conductor bonder. (Tr. 36-37). Accordingly, the ALJ determined that Plaintiff is not under disability, as defined in the Social Security Regulations, and is not entitled to DIB and/or SSI. *Id.*

The Appeals Council denied Plaintiff's request for review. Therefore, the ALJ's decision stands as the Defendant's final determination. On appeal to this Court, Plaintiff first argues that the ALJ erred by: 1) improperly evaluating Plaintiff's mental RFC; and 2) improperly weighing the opinion evidence. Upon close analysis, I conclude that none of the asserted errors requires reversal or remand.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that

4

claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he or she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him or her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**B. The ALJ's decision is supported by Substantial Evidence**

*1.     Relevant Medical Records and ALJ's Decision*

From February 2005 through April 2005, Plaintiff sought treatment for fatigue and possible depression from primary care physician Dr. John Spaccarelli, who monitored Plaintiff's progress and prescribed her medication. (Tr. 414-416). Dr. Spaccarelli's notes indicate that Plaintiff responded well to medication, which made her "much less anxious" and improved both her fatigue and her depression. (Tr. 414).

In May 2005, Plaintiff saw certified nurse practitioner ("CNP") Kimberlee Miller, who diagnosed Plaintiff with "situational depression" occasioned by her nephew's death. (Tr. 412). About a year later, Miller diagnosed Plaintiff with anxiety and depression, advising her to return in a month after prescribing medication. (Tr. 410).

There are no relevant medical records for the remainder of 2005, 2006 or 2007.

Plaintiff saw certified nurse practitioner Miller in August and September of 2010. Plaintiff reported having a "hard time" emotionally dealing with her father's recent diagnosis with lung cancer. (Tr. 377). Plaintiff reported an improvement in her anxiety at each visit. Plaintiff reported that she was "not as nervous as she was before" (Tr. 377). She was advised to continue with her medication, which had recently been increased.

In October 2010, Plaintiff had her first appointment with psychiatrist Dr. Diane Vickery, who diagnosed Plaintiff with caffeine intoxication, caffeine-related disorders and dependence, nicotine dependence, mood disorder, anxiety disorder, malnutrition, poor health habits, stress incontinence, paranoia and possible social phobia (Tr. 455). Dr. Vickery continued Plaintiff's medications and discussed her caffeine intake and general nutrition. (Tr. 455).

February 2011, Miller noted that Plaintiff was calm and "[g]etting much better" (Tr. 365) Miller also noted that Plaintiff maintained "direct eye contact," and demonstrated "no anxious mannerisms." (Tr. 365). That same month Plaintiff saw Dr. Vickery again who referred Plaintiff to a counselor and adjusted her medication. (Tr. 448).

In March 2011, Brown County General Hospital notes indicate Plaintiff was diagnosed with anxiety after experiencing shortness of breath during a test of her lungs after she reported shortness of breath and a cough (Tr. 435-439). That same month, Miller prescribed additional medication for Plaintiff who reported becoming panicky at night when she has trouble breathing. (Tr. 493).

In May 2011, Plaintiff failed to show up for her appointment with Dr. Vickery. (Tr. 444). Subsequent clinical notes indicate that Plaintiff "never returned after [Dr. Vickery] refused to write" a prescription for "benzos." (Tr. 461).

In June 2011, Dr. Michael Firmin conducted a psychological examination of Plaintiff. (Tr. 464). Dr. Firmin's assessment was based on Plaintiff's self-report and the results of a questionnaire she completed. (Tr. 464). According to Dr. Firmin, Plaintiff reported that the psychotropic medication she takes has been "partially successful" in treating her psychological symptoms. (Tr. 464). Dr. Firmin observed that Plaintiff had fair hygiene and that her mood was "generally downcast and pessimistic." (Tr. 466). During her examination, Plaintiff was able to recall a verbal list of 5 out of 6 words presented to her and her remote memory was "adequate" (Tr. 467). He found that Plaintiff's ability to articulate and formulate clear thoughts "seemed relatively unimpaired," and her "logic appeared to flow in a sequential manner." (Tr. 467).

He found that Plaintiff was unable to complete a serial seven and to reason abstractly. (Tr. 467). Dr. Firmin gave Plaintiff a Global Assessment Functioning ("GAF") score of 50 and diagnosed her with bipolar II disorder, ADHD, and panic disorder. (Tr. 468). According to Dr. Firmin, Plaintiff has "[n]o difficulty … in understanding written or verbal instructions when given a task" and found that "[h]er ability to get along with supervisors was fair." (Tr. 469-470). Based on Plaintiff's self-reports, Dr. Firmin opined that Plaintiff's "skill in working with people was indicated as being poor" and that she struggles with her ability to withstand stress. (Tr. 470). Dr. Firmin noted that during the interview, Plaintiff kept her hand over her face because she stated that she was afraid he would talk about her when the examination was over. (Tr. 468).

7

Also in June 2011, state agency reviewer, Dr. Karla Voyten diagnosed Plaintiff with affective disorders, ADD/ADHD, and anxiety disorders (Tr. 109). In her Mental Residual Functional Capacity Assessment, Dr. Voyten opined that Plaintiff should be limited to "moderately complex 3-4 step tasks," based on her limitations in understanding, memory, concentration and persistence. (Tr. 113-114). In terms of Plaintiff's ability to interact socially, Dr. Voyten opined that she should be limited to "[s]uperficial contact with the general public," based on her social limitations, but determined she was capable of interacting with her co-workers and supervisors. (Tr. 114). Dr. Voyten found Plaintiff was capable of adapting "to a static environment without frequent change." (Tr. 116).

In July 2011, Miller noted that Plaintiff was "pretty stable" and that her medication (Seroquel) "[s]eems to be working really well for her." (Tr. 487).

In September 2012, clinical notes from CNP Tonia Conn indicate that Plaintiff was diagnosed with ADHD, depression and nicotine addiction. (Tr. 531). CNP Conn noted that Plaintiff's depression was "stable at this time." (Tr. 531).

In October 2012, Plaintiff underwent diagnostic testing for her mental impairments at Talbert House by Carol Weinart PCC. (Tr. 634-643). Ms. Weinart diagnosed Plaintiff with mood disorder, anxiety disorder, and noted that she has "some symptoms of PTSD and bipolar disorder." (Tr. 641). On the mental status examination, Plaintiff was observed to be cooperative, guarded, and fearful, with fair impulse control, tense posture, restless psychomotor activity, tense facial expressions, and constricted affect. (Tr. 640).  Ms. Weinert diagnosed Plaintiff with Mood Disorder NOS and Anxiety Disorder NOS, and assigned a GAF of 50. (Tr. 641).

In addition, at the administrative hearing, Plaintiff testified that her symptoms associated with her mental impairments increased after her father passed away in October. She reported taking numerous medications for her depression and anxiety. She testified that she did not experience any side effects from her medication. With respect to activities of daily living, Plaintiff reported that she needed help with personal hygiene because she lacks motivation to get out of bed. She testified that she does not attend church, does not socialize with friends and see her mother once or twice a week. She also reported that she spends 23 hours of the day in bed.

Based on the forgoing, the ALJ determined that plaintiff's mental impairments resulted in the following functional limitations:

> She is limited to simple, routine and repetitive tasks in a job with only occasional changes in the work setting and only occasional interaction with supervisors and co-workers, and brief and superficial interaction with the general public.

(Tr. 26).

Plaintiff, however, asserts that the ALJ's mental RFC is not supported by substantial evidence. Specifically, Plaintiff contends that the ALJ's RFC analysis did not properly consider Plaintiff's consistent GAF scores, and did not adequately account for Plaintiff's agoraphobia and limitations in social functioning. Plaintiff also asserts that the ALJ erred in giving only partial weight to the opinion of Dr. Firmin, the examining psychologist. (Tr. 35). Plaintiff's assertions will be addressed in turn.

    2.    GAF Scores

Plaintiff argues first that the ALJ's RFC assessment failed to properly account for Plaintiff's consistent GAF scores, indicating serious symptoms. Plaintiff argues that her

9

GAF scores establish that she has very significant psychological impairments which severely functionally limit her. (Doc. 11 at 14). Plaintiff's contention lacks merit.

The Global Assessment of Functioning (GAF) is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM–IV categorizes individuals with scores of 41–50 as having "serious" symptoms. See DSM–IV at 32.

The undersigned recognizes that a GAF score can be helpful in assessing an individual's mental RFC. *Kornecky v. Comm'r of Soc. Sec.,* 167 Fed. Appx. 496, 503 n. 7 (6th Cir.2006). At the same time, however, a GAF score is a physician's subjective evaluation and not raw medical data. *Kennedy v. Astrue,* 247 Fed. Appx. 761, 766 (6th Cir.2007). GAF scores do not have a direct correlation to the severity requirements in our mental disorders listings. Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 F.R. 50765 (Vol.162, August 21, 2000). The Commissioner explicitly denies endorsing use of the GAF scale in Social Security disability programs, and states that "[i]t does not have a direct correlation to the severity requirements in our mental disorders listings." 65 Fed.Reg. 50,745, 50,764–765 (Aug. 21, 2000). In addition, a GAF score merely represents a "snapshot" of a person's "overall psychological functioning at or near the time of the evaluation. *See Martin v. Commissioner,* 61 Fed. Appx. 191, 194 n. 2 (6th Cir.2003). As such, a GAF assessment

is isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a full-time basis. *Arnold v. Astrue,* 2:10–CV–013, 2010 WL 5812957 (S.D.Ohio Oct.7, 2010) report and recommendation adopted, 2:10–CV–13, 2011 WL 597064 (S.D.Ohio Feb.10, 2011).

"GAF scores, therefore, are not raw medical data and do not necessarily indicate ... symptoms or mental functioning." *Kennedy v. Astrue, Comm'r of Soc. Sec.,* 247 F. App'x 761, 766 (6th Cir.2006) (Greer, D.J., joined by Clay & Sutton, JJ.). Additionally, a GAF score alone, without a sufficient accompanying interpretative and explanatory narrative, may result in several different interpretations. For example, because of the way that the GAF score ranges are defined, a particular GAF score alone may not constitute a clear statement of medical opinion directed specifically at the relevant capacity of the claimant (such as residual capacity to perform basic work functions). Neither the Commissioner nor the Sixth Circuit requires that GAF scores, even consistent ones, be given any weight at all. As found by the Sixth Circuit:

> T]he Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" The GAF scores, therefore, are not raw medical data and do not necessarily indicate improved symptoms or mental functioning.

*Kennedy v. Astrue,* 247 Fed. App'x 761, 766 (6th Cir.2007) (citations omitted) (finding that increase in GAF score from 55 to 60 was insignificant). *See also Oliver v. Comm'r of Soc. Sec.,* No. 09–2543, 2011 WL 924688, at *4 (6th Cir. Mar.17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly

11

helpful by itself"); *Turcus v. Soc. Sec. Admin.,* 110 Fed. App'x 630, 632 (6th Cir.2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

In light of the foregoing, Plaintiff's reliance on GAF scores is not dispositive of the issue of disability. As such the ALJ's alleged failure to properly account Plaintiff's consistent GAF scores is not error. As more fully explained below, the ALJ's decision indicated that he thoroughly reviewed the evidence of record and properly considered the functional limitations associated with Plaintiff's mental impairments.

   3. *Evaluation of agoraphobia and social functioning*

Plaintiff next argues that the ALJ did not adequately accounted for Plaintiff's agoraphobia. In this regard, Plaintiff notes that the ALJ stated that she cannot understand why Plaintiff claims to spend 23 hours per day in bed, since Plaintiff's physical impairments do not appear to be sufficiently functionally limiting to require so much time in bed. (Tr. 32). In making this finding however, Plaintiff asserts that the ALJ ignored the fact that Plaintiff's psychological impairments are the logical cause for such behavior on Plaintiff's part (and in fact, Plaintiff repeatedly reported to her physicians that it was her psychiatric impairments which led her to stay in bed, since she felt "safest" in bed, at home). (See, e.g., Tr. 448, 464, 470) ("Most of the time people are talking about me, so I want to stay inside. I spend most of the time in my room. I feel safe there."). Plaintiff's contention is unavailing.

As noted by the ALJ in his decision, The ALJ considered this claim and found "it extreme in nature," as Plaintiff's statements at the hearing and activities of daily living belie her claim as she admitted to changing her clothes, playing with her dogs and

showering, all of which "tend[] to belie her testimony that she spends 23-24 hours a day in bed." (Tr. 32 n.5). Moreover, both the medical records and Plaintiff's testimony demonstrate that Plaintiff attends numerous appointments weekly with both her physical and mental healthcare providers. (Tr. 34, 60, 69, 72). In fact, other than Plaintiff's statement to Ms. Weinart in October 2012 that she "stays in bed all day and has no motivation to take care of her daily needs," (Tr. 33, 640-641) none of the records indicate Plaintiff told any other mental health care providers that her symptoms had become that severe. Clinical notes from CNP Conn just one month earlier indicate that Plaintiff's depression was "stable at this time." (Tr. 33, 531).

Accordingly, the ALJ's decision is substantially supported in this regard.

*4. Weight assigned to Dr. Firmin*

Last, Plaintiff contends that the ALJ erred in giving only partial weight to the opinion of Dr. Firmin, the examining psychologist. (Tr. 35). Plaintiff's contention is unavailing.

In evaluating the opinion evidence, "[t]he ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley v. Commissioner of Social Sec.,* 581 F.3d 399, 406 (6th Cir.2009) (quoting *Wilson v. Commissioner,* 378 F.3d 541, 544 (6th Cir.2004). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examinations, the nature and extent of the treatment relationship, supportability of the

opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson,* 378 F.3d at 544; see also 20 C.F.R. § 404.1527(d)(2). Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2); but see *Tilley v. Comm'r of Soc. Sec.,* No. 09–6081, 2010 WL 3521928, at *6 (6th Cir.Aug.31, 2010) (indicating that, under Blakely and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(d)(2) for weighing medical opinion evidence within the written decision).

As such, the opinions of treating and examining sources are generally entitled to more weight than opinions of consulting and non-examining sources. 20 C.F.R. § 404.1527(d); see also *West v. Comm'r Soc. Sec. Admin.,* 240 Fed. Appx. 692, 696 (6th Cir.2007) (citing *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 536 (6th Cir.1981)) ("[R]eports from treating physicians generally are given more weight than reports from consulting physicians...."). However, an ALJ need not credit a treating physician opinion that is conclusory and unsupported. See *Anderson v. Comm'r Soc. Sec.,* 195 Fed. Appx. 366, 370 (6th Cir.2006) ("The ALJ concluded, properly in our view, that the [treating physician's] treatment notes did not support and were inconsistent with his conclusory assertion that appellant was disabled."); see also *Kidd v. Comm'r of Soc. Sec.,* 283 Fed. Appx. 336, 340 (6th Cir.2008) (citing *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 287 (6th Cir.1994)) (holding that an ALJ need not credit a treating physician's conclusory opinions that are inconsistent with other evidence).

14

As noted above, Dr. Firmin conducted a psychological consultative evaluation of Plaintiff in June 2011.  Dr. Firmin diagnosed Plaintiff with Bipolar II Disorder, most recent episode hypomanic; ADHD; and Panic Disorder with Agoraphobia, and assigned her a GAF score of 50, indicating serious functional limitations. *Id.*  Dr. Firmin observed that Plaintiff's dress was messy and her hygiene was only fair; her overall thought processes were characterized by pessimism; her facial expressions were sad and anxious and eye contact was avoidant; her mood was generally downcast and pessimistic; her affect was judged to be sad; and she showed outward manifestations of anxiety including sighing, fidgeting, and leg shaking. *Id.*  Dr. Firmin further noted findings of decreased memory and defects in concentration. He further opined that "overall, the claimant's abilities with connecting with people show substantial difficulty." (Tr. 470).  In addition, "based on clinical presentation," Dr. Firmin disagreed with Plaintiff's belief that she would be capable of managing any funds granted to her. (Tr. 472).

The ALJ assigned Dr. Firmin's opinion "some weight" because the bulk of "his work-related limitations were based on [Plaintiff's] self-report," and the ALJ found Plaintiff less than credible. (Tr. 35, 464). While the ALJ did credit Dr. Firmin's opinion to the extent that he assessed that Plaintiff "has some difficulties with others and completing tasks," that portion of his opinion is reflected in the RFC, which limits both the types of tasks Plaintiff can undertake and the frequency with which she should interact with others. (Tr. 35, 467-486). As for Dr. Firmin's opinion, the ALJ considered that he formed his opinion through a "face-to-face clinical interview with the claimant

15

and her completion of a questionnaire," which implicated Plaintiff's credibility as the results depended on her self-reports. (Tr. 35, 464).

Plaintiff, however, argues that the restrictions in the RFC do not go far enough and that the ALJ "has not adequately accounted for Plaintiff's limitations in social functioning." (Doc. 11 at 14). Plaintiff's argument suggests that Dr. Firmin's opinion that Plaintiff's "abilities with connecting with other people show substantial difficulty" is tantamount to an opinion that Plaintiff is markedly impaired in social functioning. *Id.* at 15. The evidence of record, however, does not support such an interpretation of Dr. Firmin's findings.

As found by the ALJ, Plaintiff's anxiety symptoms are aggravated around people she does not know, and as such, the ALJ limited her interactions with the general public to those that are brief and superficial. (Tr. 34). Notably, the evidence of record indicates that despite her social limitations, Plaintiff's symptoms are sufficiently stable and controlled such that limited social interaction is possible. (Tr. 365, 514, 531). The other opinion evidence supported an RFC providing for occasional contact with co-workers and supervisors, and brief, superficial interactions with the general public. (Tr. 114, 156). *See Freudenberger v. Astrue*, 2011 WL 1114407 (S. D. Ohio Feb. 28, 1011) (Bowman, MJ) ("[W]here conclusions regarding a claimant's functional capacity are not substantiated by objective evidence; the ALJ is not required to credit those conclusions").

In this regard, the ALJ's decision indicates that he considered the opinions of the state agency reviewers, Drs. Voyten and Warren, both of whom opined that Plaintiff should be restricted to superficial contact with the general public and limited to

moderately complex tasks. (Tr. 35, 112-114, 155-157).  The ALJ explained that these opinions were "generally consistent with the objective medical evidence of record" (Tr. 35, 112-114, 155-157, 487, 469-470, 365). The ALJ also pointed out that the opinions of the state agency reviewers, as non-examining doctors, "do not as a general matter deserve as much weight as those examining or treating physicians," but acknowledged that those opinions nevertheless merited weight. See 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to the opinions from your treating sources…"); 20 C.F.R. § 404.1527(e) ("We consider all evidence from non-examining sources to be opinion evidence."). Notably, the ALJ acknowledged Plaintiff's ongoing struggle with anxiety and depression, which her ultimate RFC reasonably accommodates by "further limiting her interactions with others and task completion." (Tr. 35).

Plaintiff also argues that the ALJ failed to give proper consideration to Dr. Firmin's findings regarding Plaintiff's memory limitations, arguing that the clinical evidence proved that Plaintiff's symptoms were severe. (Doc. 11 at 17). Specifically, Plaintiff urges that the ALJ's citation of Dr. Firmin's finding that Plaintiff could recall 5 out of 6 words mischaracterized Plaintiff's abilities because the ALJ failed to emphasize the finding that fifteen minutes later, Plaintiff could only recall two of those words. *Id.*

 However, as noted by the Commissioner, the ALJ's decision clearly demonstrates she considered Plaintiff's memory limitations as she acknowledged that Dr. Firmin found that she "was unable to complete serial sevens or abstract reasoning" (Tr. 30, 467). Nevertheless, in light of the record evidence as a whole, including Dr. Firmin's further observations that Plaintiff's remote memory was "adequate," the ALJ fashioned an RFC that reasonably took into account Plaintiff's moderate memory

limitations. (Tr. 26). The increased limitations Plaintiff urges, therefore, are not supported by the other medical evidence. Both of the other state reviewers found that limiting Plaintiff to "moderately complex 3-4 step tasks" was sufficient to address Plaintiff's limitations around memory. (Tr. 113-114, 156-157). Thus, the ALJ properly credited Dr. Firmin's opinion to the extent that Plaintiff was limited to simple, routine, repetitive tasks as that was supported by the record. (Tr. 26).

In sum, the ALJ's decision indicated that he thoroughly reviewed the evidence of record and properly considered the functional limitations associated with Plaintiff's mental impairments.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT**: 1) The decision of the Commissioner to deny Plaintiff's DIB/SSI benefits be **AFFIRMED** because it is supported by substantial evidence in the record as a whole; and 2) As no further matters remain pending for the Court's review, this case be **CLOSED.**

                                                         */s Stephanie K. Bowman*
                                                         Stephanie K. Bowman
                                                         United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| DEANNA COMBERGER, | Case No. 1:14-cv-435 |
| Plaintiff, | Beckwith, J. |
| | Bowman, M.J. |
| v. | |
| CAROLYN W. COLVIN, Acting COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).